IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

CHEYENNE NICOLE SMITH
a/k/a Tucker                                                                      PLAINTIFF

Civil No. 2:23-cv-02111-TLB-MEF

v.

JAILER MELISSA GAMBLE,
JAILER AUSTIN TERWILLIGER[1],
SHERIFF SCOTT SAWYER,
JAIL ADMINISTRATOR CRAIG MOHR[2]                                  DEFENDANTS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This is a civil rights action filed under 42 U.S.C. § 1983. Pursuant to the provisions of 28 U.S.C. §§ 636(b)(1) and (3), the Hon. Timothy L. Brooks, United States District Judge, referred this case to the undersigned for the purpose of making a Report and Recommendation.

Currently before the Court is the Defendants' Motion for Summary Judgment, Brief in Support, and Statement of Indisputable Material Facts filed on June 7, 2024. (ECF Nos. 51, 52, 53). Plaintiff filed her Response, Brief [in] Support, and Statement of Indisputable Material Facts on August 5, 2024. (ECF Nos. 59, 60, 61). Defendants filed their Reply on August 19, 2024. (ECF No. 64). The matter is ripe for decision.

---

[1] Plaintiff was unable to provide a valid service address for Defendant Terwilliger, and the time to do so has long passed. (ECF No. 20).

[2] Plaintiff named Defendant "Craig Moore" as the Jail Administrator. (ECF No. 10). In his Affidavit, the Defendant states his name is Craig Mohr. (ECF No. 53-1 at 1). The Court will use the correct spelling of this Defendant's name.

# I.    BACKGROUND

Plaintiff filed her Complaint on August 30, 2023.  (ECF No. 1).  She sought leave to amend, which was granted (ECF Nos. 6, 9), and she filed her Amended Complaint (ECF No. 10) on September 21, 2024.

As her first claim, Plaintiff alleges that she was arrested and booked into the Polk County Jail on November 14, 2021, and she informed the staff at the jail that she was in the second trimester of pregnancy.  (ECF No. 10 at 5).  She lists the dates of this claim as November 14, 2021, through December 15, 2021.  (*Id*.).  She names as Defendants Sheriff Sawyer, Jail Administrator Mohr, and the Polk County Jail[3] for this claim.  (*Id*.).  Plaintiff alleges that Defendants Sawyer and Mohr "are the ones that decide medical care at this facility and they chose not to provide prenatal care that would have alerted to complications and the death of my baby."  (*Id*. at 5-6).  She further alleges Defendants did not offer any medical care until after she delivered her baby alone in her cell.  (*Id*. at 6).  Plaintiff proceeds against Defendants Sawyer and Mohr in their official and individual capacities.  (*Id*.).  To support her official capacity claim she alleges, "[d]enial for medical care for a second trimester pregnancy to a prisoner in custody."  (*Id*.).  Plaintiff alleges that she delivered the baby in her cell on December 15, 2021.  (*Id*. at 7).

For her second claim, Plaintiff alleges that from November 14, 2021, through December 15, 2021, Defendants Sawyer and Mohr denied her prenatal care for her second trimester pregnancy.  (ECF No. 10 at 6-7).  Plaintiff alleges she put in a kiosk request for prenatal care the first week of December.  (*Id*. at 7).  She requested that she be able to seek prenatal care, but her request was denied by Sawyer and Mohr.  (*Id*.).  Plaintiff alleges she let them know that her first

---

[3] The Polk County Detention Center was terminated as a Defendant in this case on September 22, 2023, as a jail is not a person or legal entity subject to suit.  (ECF No. 11).

appointment was overdue by a month, and it was important for the health and safety of her baby. (*Id*.). She alleges that lack of medical care caused the death of her baby. (*Id*.). Plaintiff proceeds against Defendants in their official and individual capacity for this claim. (*Id*. at 8). For her official capacity claim, Plaintiff alleges, "[d]enial of request of routine medical care for a second trimester pregnancy to a prisoner in custody." (*Id*.).

For her third claim, Plaintiff names Defendants Jailer Melissa Gamble and Austin Terwilliger.[4] (ECF No. 10 at 8). She alleges these Defendants denied her medical care on December 14, 2021, through December 15, 2021, and that they denied her emergency medical care on these days. (*Id*.). Plaintiff alleges that on December 14, 2021, she told Defendant Melissa Gamble and Austin Terwilliger that she needed emergency medical care because she was bleeding, had lost her mucous plug, and was hurting. (*Id*. at 9). Defendants told her to go lay down. (*Id*.). She alleges they did not alert the Sheriff or the Jail Administrator to get approval for emergency care. (*Id*.). They padlocked her into her cell at 2:00 a.m., did not do routine checks, and there was no emergency call button in her cell.[5] (*Id*.). Plaintiff alleges that she "banged on" the door at 4:40 a.m. to get the jailer's attention and they ignored her. (*Id*.). She alleges she delivered her baby at 4:35 a.m. alone in her cell. (*Id*.). She alleges she was in shock and did not know what to do. She

---

[4] Plaintiff initially named this Defendant as Austin Vaught. This name was corrected to Terwilliger on April 3, 2024. (ECF No. 45).

[5] The case law that exists on this subject concludes that the mere lack of an intercom or call button in a cell, standing alone, does not rise to the level of a constitutional violation. For example, in *Garner v. City of Philadelphia*, 2013 WL 4401327, at *6 (E.D. Pa. Aug. 16, 2013), an Eighth Amendment conditions of confinement case, the court concluded that "[a]lthough panic buttons may offer inmates additional safety and protection, we cannot find that active panic buttons constitute a 'minimal civilized measure of life's necessities.'" *See also DuPont v. Skrah*, 2017 WL 1160584, at *3 (D. Or. Jan. 30, 2017), *report and recommendation adopted*, 2017 WL 1159723 (D. Or. Mr. 27, 2017) ("[A]lthough the Eighth Amendment requires inmates to be able to communicate with corrections officers in order to summon medical assistance if necessary, it does not specifically mandate the availability of a functioning intercom in each prisoner's cell."). This portion of Plaintiff's claim will not be considered further.

continued to try to get their attention until about 4:45 a.m. (*Id*. at 9-10). She alleges that instead of immediately calling medical personnel, Defendant Gamble removed her from her cell with her child still laying in the sink and put her in the cell next door with two other inmates. (*Id*. at 10). Gamble allegedly told her she needed to contact the Jail Administrator to find out what to do. (*Id*.). Defendant Mohr told her to call the ambulance. (*Id*.). She and the baby were then transported to Mena Regional Hospital, and the baby was pronounced dead by Dr. John Mesto. (*Id*.). She stayed overnight at the hospital and the Jail Administrator released her on her own recognizance. (*Id*.). Plaintiff alleges that if medical care had been given, her child might not have died, or "at least would not have been born in the manner she was born." Plaintiff alleges she now suffers with severe depression, PTSD, anxiety, pain and suffering. (*Id*.). Plaintiff proceeds against Defendants in their official and individual capacity for this claim. (*Id*. at 9). For her official capacity claim, she states, "[d]enial of emergency medical care for a second trimester pregnancy for a prisoner while incarcerated." (*Id*.).

Plaintiff seeks an unidentified amount of compensatory and punitive damages. (ECF No. 10 at 11).

Defendants filed their Motion for Summary Judgment and supporting documents on June 7, 2024. (ECF Nos. 51, 52, 53). They construe Plaintiff's Amended Complaint to include three specific claims: "1. A denial of general prenatal care; 2. A denial of emergency medical care for symptoms occurring at 9:00 p.m. on December 14, 2021, and 3. A denial of emergency medical care regarding her December 15, 2021 miscarriage." (ECF No. 52 at 6 n. 1). Should the Court find otherwise Defendants reserved the right to address any additional claims. (*Id*.).

They argue summary judgment in their favor is appropriate for several reasons. First, they contend there is no proof that Sheriff Sawyer was personally involved. (ECF No. 52 at 3). Second,

they assert they were not deliberately indifferent because there was no objectively serious medical need, stating: Plaintiff's pregnancy did not escalate to an objectively serious medical need prior to December 15, 2021; Plaintiff's general prenatal care does not amount to a serious medical need; and Plaintiff's purported 9:00 p.m. symptoms on December 14, 2021, did not escalate to a serious medical need. (*Id*. at 6-14). Third, Defendants argue they did not have subjective knowledge of a serious medical need because: Plaintiff did not request general prenatal care during her incarceration with PCDC; Defendant Gamble was not subjectively aware of a serious medical need at 9:00 p.m. on December 14, 2021; and that Defendants did not disregard Plaintiff's serious medical need after her miscarriage on December 15, 2021. (*Id*. at 15-23). Fourth, Defendants state they are entitled to qualified immunity. (*Id*. at 24-27). Fifth, Polk County had no policy which violated Plaintiff's constitutional rights. (*Id*. at 27-30).

Plaintiff filed her Response and supporting documents on August 5, 2024. (ECF Nos. 59, 60, 61). In her Response, Plaintiff attempts to add new claims on behalf of her deceased daughter. (ECF No. 59 at 1). Plaintiff also repeats her arguments that she should have been provided prenatal care upon entry into the Polk County Jail. (*Id*. at 1). She argues that if prenatal care had been provided, any health issues concerning the baby could have been detected and emergency medical action taken. (*Id*. at 2). Plaintiff alleges that Defendant Gamble took time to serve the other breakfasts on the morning in question, and that time could have saved her baby. She also argues Gamble acted inhumanely by moving her to another cell and leaving her baby alone in her original cell. (*Id*. at 2). She argues Sheriff Sawyer oversees his staff and is responsible for them following policies. (*Id*.). In her Brief, Plaintiff largely repeats the allegations of her Amended Complaint. (ECF No. 60). Plaintiff references the video for Dayroom 23 in the hallway, time stamp 28:50-31:45. She states this is when she advised Defendant Gamble of spotting and a mucous plug. (*Id*.

at 2).  She also references video for Hallway 31 as the second request for emergency help.  (*Id*.).
She states that at this point she had already delivered her child.  (*Id*.).

Although Plaintiff filed a document labelled as a Statement of Indisputable Facts (ECF No.
61), the 14 paragraphs included do not correspond to the 236 paragraphs of Defendants' Statement
of Facts.  She does reference several videos of the Dayroom and Hallway.  She reports normal
daily activities in most of them.  (*Id*. at 4-5).  She references Dayroom Video 21 as when she
informed Defendant Gamble that she lost her mucous plug.  (*Id*. at 4).  She references Video
Hallway 31 and 32 as detailing activities occurring the morning of December 15, 2021.  (*Id*. at 5).
Plaintiff also provides copies of exhibits with highlighting in places.  No explanation is provided
with the highlighting, and the Court will not speculate.  Further, as the Court explained in its Order
directing the Summary Judgment Response, the Court will not sift through documents attempting
to find factual support for claims.

Defendants filed their Reply on August 19, 2024.  (ECF No. 64).  Defendants note that
Plaintiff begins her Response by appearing to allege a separate cause of action on behalf of the
unborn child.  (*Id*. at 1).  They correctly argue that Plaintiff first raised this claim at this late stage
of the case.  (*Id*.).  They further argue that there is no evidence that Plaintiff has standing to raise
this claim.  (*Id*.).  They note that, according to this Court's Scheduling Order, the deadline to amend
pleadings or join new parties was April 8, 2024.  (*Id*. at 1-2).  The Court will not address any
claims brought on behalf of the deceased child, as they are brought untimely.

Defendants address her argument that a routine prenatal visit would have alerted her to an
issue with the pregnancy.  (ECF No. 64 at 2).  They contend there is no medical evidence to support
this argument, which is speculative at best.  (*Id*.).  They believe Plaintiff was approximately 13-14
weeks pregnant at intake and approximately 18 weeks at delivery; thus, they say it is unlikely that

6

she would have had more than one or two visits at this stage of pregnancy.  Further, they note that Plaintiff admitted in her deposition that she knew she was pregnant prior to her incarceration and failed to obtain prenatal care at that time.  (*Id*.).

Defendants also note Plaintiff continues to argue that an emergency call button would have resulted in a quicker response on the morning of December 15, 2024.  (ECF No. 64 at 2).  They assert this argument is devoid of medical evidence and speculative.  (*Id*.).  They further point out that the medical evidence from Mena Regional hospital indicates that the fetus appears to have passed away approximately 3-5 days prior to delivery.  (*Id*.).  Of further significance, Plaintiff testified that her labor and miscarriage occurred within minutes.  (*Id*.).  Thus, Defendants argue there is no evidence that a quicker response would have resulted in a different outcome.  (*Id*. at 2-3).

Defendants respond to Plaintiff's argument that Defendant Gamble failed to provide emergency medical care after she gave birth.  (ECF No. 64 at 3).  They point to Plaintiff's deposition testimony that, upon learning of the Plaintiff's miscarriage, Defendant Gamble called an ambulance which arrived within 15 minutes of Plaintiff's delivery.  (*Id*. at 3).

They counter Plaintiff's argument that routine medical care should have been scheduled by stating:

> There is no robust consensus of case law requiring a detention center to schedule prenatal care for an inmate where there is no request for medical care during incarceration, where the inmate did not have established prenatal care prior to her incarceration, and where the inmate showed no signs of imminent labor or complication.  Plaintiff had the opportunity to seek medical care through the sick call process, but she did not submit any sick call requests during her incarceration. It is only now, after the fact, that Plaintiff argues that she needed prenatal care during her incarceration.

(ECF No. 64 at 4).  Thus, Defendants assert they are entitled to qualified immunity on this claim. (*Id*.).

Defendants deny that the video footage supports Plaintiff allegations, particularly as there is no audio. (ECF No. 64 at 4-5). On August 23, 2024, Defendants submitted copies of the videos which had been provided to Plaintiff in the discovery process. (ECF No. 65).

On September 9, 2024, Plaintiff filed a Sur-Reply. (ECF No. 66). This unauthorized pleading was struck from the summary judgment record the next day. (ECF No. 68).

### Defendant Gamble's Incident Report

To provide context to the claims and video clips, Defendant Gamble's Incident Report is quoted:

> On 12/15/2021 at or around 0500, I (Officer Melissa Brecheisen, D5) went to North wing to serve breakfast trays. As I set inmate Cheyenne Smith's tray in the bean hole of her cell, she stated "Melissa I think I just had a miscarriage." I asked her what was going on, and if she was bleeding. She said she was and asked me to turn on the cell lights so I could look in her cell. I turned the lights on and found a large amount of blood and toilet paper in the toilet, and what looked to be a fetus in the sink. I then had Smith step out of her cell and told her that I'd let her sit in the cell with Richey and Shores, as she preferred. I then quickly finished serving the females trays and reported to Officer Austin Terwilliger about what was going on. I then called jail administrator Craig Mohr at 0504, to which he advised to call EMS to have her transported to the hospital to be checked out. I called EMS at 0508. They got a crew in route, and I went back to North wing to inform Smith and gather more information. She told me that last night (12/14/2021) around 2000-2100, she noticed that she had some discharge and that she didn't think too much of it. Then she said that about an hour and a half before I served breakfast, she began to cramp, and she described it as feeling like contractions. She stated that she told the other females in the wing but didn't tell us (jail staff) in case "it turned out to be nothing." Then she said that she had "passed it" "just a little while" before I came to the wing to serve trays. EMS arrived at 0516, removed the fetus from the cell, and then transported Smith to the hospital.

(ECF No. 53-4 at 1; ECF No. 61 at 6).

### Videos

The Court has reviewed the videos referenced by Plaintiff in her Brief and Statement of Facts. As previously noted, the Court confirms there is no audio.

**Dayroom 21**: In her Statement of Facts, Plaintiff identifies this video as when she told Defendant Gamble about the slightly bloody mucous she discovered on her toilet paper after she urinated on the evening of December 14, 2021.  (ECF No. 61 at 4).  In this video there are three female inmates in the dayroom, including Plaintiff.  What appears to be animated discussions occur between the inmates throughout the video, with the inmates smiling and laughing at times.  Plaintiff and another inmate tinker with some sort of equipment with a lit screen on the wall.  At 00:35:43 one inmate leaves the dayroom and appears to come back with a tissue.  Plaintiff appears to dab her eyes, but she continues watching the lit screen.  The inmate pats her on the back and gives her a one-armed hug.  Plaintiff appears to blow her nose.  The back pat and hug are repeated.  Plaintiff appears to smile and continues looking at the screen.  Other inmates are seen smiling and laughing.  Plaintiff approaches the screen and taps at it.  She hugs the second inmate.  At 00:42:36 Plaintiff leaves the dayroom, but she returns at 00:50:31.  The inmates are seen laying down to watch TV.  At 00:52:51 Defendant Gamble and a male guard open the dayroom door.  One inmate points at Plaintiff and Plaintiff comes to the door and takes something from the guard.  She then immediately returns to the screen on the wall.  The female guard returns and Plaintiff points to something on the screen.  Plaintiff and a male guard look in the dayroom and then leave the doorway.  The three inmates stand in the doorway and hall and appear to talk to the guards.  They come back into the cell and appear to be wiping something from a small cup onto their feet.  At 00:56:23 Plaintiff leaves the dayroom again and then returns at 00:59:14.  None of the inmates appeared to be in any physical distress.  Other than the brief period of possible tears from Plaintiff, the overall mood of the group appeared to be light-hearted.

**Dayroom 23 Hallway**: In her Brief, Plaintiff identifies this video as when she contacted Defendant Gamble concerning the bloody mucous on her toilet paper.  (ECF No. 60 at 2).  At

9

timestamp 00:17:41 Plaintiff backs out of the cell nearest the camera and walks down the hall to her cell. She fiddles with hair bun. At 00:18:17 another inmate walks down to Plaintiff's cell doorway and then walks back. At 00:19:17 the same inmate appears at the door of the closest cell briefly. At 00:25:11 Plaintiff exits her cell and walks into the second cell. At 00:27:34, the head of a masked female guard appears. She opens the cell door closest to the camera. The top of a tan hat appears briefly beside her to the left. The guard moves off-screen. A blonde inmate comes out of the cell. She seems to be talking to the guard, but one can mostly see only the top of the inmate's head. A guard moves partially back into screen view. A male guard with a tan hat appears briefly and talks though the cell door. A third inmate and the blonde inmate appear on the screen. Plaintiff appears at the door, although her face shows only briefly. It is mostly her hair bun that appears on screen. The three appear to be talking to the guards. The blonde inmate smiles and is seen talking, then she smiles again. The three inmates return to the cell. At 00:29:52 Plaintiff exits the cell and returns to the next cell down. She then comes back out again and returns to cell closest to camera with the other inmates. At 00:31:12 Plaintiff exits the cell again and walks down the hall. She looks out the window by the exit briefly and returns to the far cell. At 00:33:52 Plaintiff walks back to the other cell. Plaintiff is seen fiddling with hair again. At 00:34:27 another inmate comes out of the cell, looks out the window, looks in the far cell, and comes back to the closest cell. No further activity occurs during the rest of the video.

**Hallway 31**: In her Brief, Plaintiff describes this as her second request for emergency help, and indicates it is post-delivery. (ECF No. 60 at 2). Timestamp 00:39:00: Jailer Gamble squats down and talks through bean-hole. Jailer Gamble immediately walks down the hall and comes back quickly with the key. She opens the cell door and pauses a second. She talks to a male guard. She turns from the cell with what appears to be a shocked expression and gestures with her hands

while walking back toward the male guard. The male guard looks in cell and walks away quickly. Timestamp 00:40:36: Jailer Gamble comes back and gestures for Plaintiff to come out of the cell. Plaintiff appears wrapped in a blanket and follows Jailer Gamble down the hall. Plaintiff appears to be crying; she leans against the wall. She goes into the next cell. Timestamp 00:41:33: Jailer Gamble comes back and finishes breakfast delivery. Both male and female guard looking through the bean-hole to the second cell. Timestamp 00:55:48: Jailer Gamble takes away a food tray. Timestamp 00:56:24: Jailer Gamble comes back and talks through the bean-hole again. Both guards' body language and facial expressions (to the extent that any could be seen with face masks) appear to show concern and empathy throughout the video. At 01:00:00 Plaintiff is still in the cell. Elapsed time is approximately 21 minutes.

**Hallway 32**: In her Statement of Facts, Plaintiff identifies this as a continuation of the post-delivery response. (ECF No. 61 at 5). An inmate appears in the hallway at timestamp 00:00:12, and then returns to a cell carrying what something white. Time stamp 00:00:44: Jailer Gamble hands a roll of toilet paper into the cell. At time stamp 00:00:53, an inmate reappears at the cell door and hands Jailer Gamble a white drawstring bag. At 00:01:10 Plaintiff appears in the doorway and rewraps herself in blanket as she walks. She goes back to her initial cell. An EMT appears at 00:03:12 and is seen moments later coming out of cell carrying the fetus in a biohazard bag at 00:06:42.

## II.    LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III.    ANALYSIS

### A.    Plaintiff's Failure to Comply with Local Rules

Plaintiff submitted a document entitled "Statement of Indisputable Material Facts" with her Summary Judgment Response. (ECF No. 61). This document was not filed in compliance with either the Court's Order directing her Summary Judgment Response or the Local Rules of Civil Procedure. Local Rule 56.1(a) requires any party moving for summary judgment to submit a separate statement of undisputed material facts. Local Rule 56.1(b) requires the non-moving party opposing the summary judgment motion to file a separate statement of disputed facts. *Pro se* inmates are advised of this requirement in the Order directing them to file a summary judgment response. Specifically, *pro se* inmates are advised in the Order directing their Response that "[i]f

12

you dispute any facts contained in the Defendants numbered Statement of Undisputed Facts, you must identify the number of the paragraph you dispute and you must explain why you dispute the statement." *Pro se* inmates are also advised of this requirement in the District's Prisoner Litigation Guide, which contains an example to help them understand the concept of using the same paragraph numbering as that used by the moving party in their own statement of disputed facts. Here, Defendants provided a Statement of Indisputable Material Facts comprised of 236 numbered paragraphs. Plaintiff's Statement of Facts is comprised of 14 paragraphs, and Plaintiff does not attempt to correspond those 14 paragraphs to any of those in Defendants' Statement of Facts or to dispute any identifiable paragraphs.

Due to Plaintiff's failure, Defendants' Statement of Facts is deemed admitted pursuant to Local Rule 56.1(c). In determining whether there are genuine disputes of material fact, however, the Court has also considered the allegations set forth in Plaintiff's verified Amended Complaint. A verified complaint is the equivalent of an affidavit for summary judgment purposes. *See, e.g., Roberson v. Hayti Police Dep't.*, 241 F.3d 992, 994-95 (8th Cir. 2001). "[A] complaint signed and dated as true under penalty of perjury satisfies the requirements of a verified complaint . . .." *Id.* As the Court in *Roberson* pointed out, "[a]lthough a party may not generally rest on his pleadings to create a fact issue sufficient to survive summary judgment, the facts alleged in a verified complaint need not be repeated in a responsive affidavit to survive the summary judgment motion. *Id.* The Court will, therefore, "piece[] together [Plaintiff's] version of the facts from the verified complaint . . .." *McClanahan v. Young*, No. 4:13-cv-04140, 2016 WL 520983, *1 (D.S.D. Feb. 5, 2016).

**B.**    **No Evidence of Deliberate Indifference**

The Eighth Amendment prohibition of cruel and unusual punishment prohibits deliberate indifference to prisoners' serious medical needs. *Luckert v. Dodge County*, 684 F.3d 808, 817 (8th Cir. 2012). To prevail on her Eighth Amendment claim, Plaintiff must prove that Defendants acted with deliberate indifference to her serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

The deliberate indifference standard includes "both an objective and a subjective component: 'The [Plaintiff] must demonstrate (1) that [she] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)).

To show that she suffered from an objectively serious medical need, the Plaintiff must show she "has been diagnosed by a physician as requiring treatment" or has an injury "that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (citation omitted).

For the subjective prong of deliberate indifference, "the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation." *Popoalii v. Correctional Med. Servs*, 512 F.3d 488, 499 (8th Cir. 2008) (citation omitted). "Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." *Id*.

It is well settled that "[a] prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation." *Nelson v. Shuffman*, 603 F.3d 439, 449 (8th Cir. 2010) (internal citation omitted). An

14

"inmate must clear a substantial evidentiary threshold to show the prison's medical staff deliberately disregarded the inmate's needs by administering inadequate treatment." *Id.* (internal citations omitted). Despite this, issues of fact exist when there is a question of whether medical staff exercised independent medical judgment, and whether the decisions made by medical staff fell so far below the reasonable standard of care as to constitute deliberate indifference. *See Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990).

Deliberate indifference may also be manifested by "prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104–05. However, the "Constitution does not require jailers to handle every medical complaint as quickly as each inmate might wish." *Jenkins v. County of Hennepin, Minn.*, 557 F.3d 628, 633 (8th Cir. 2009). "A prisoner alleging a delay in treatment must present verifying medical evidence that the prison officials 'ignored an acute or escalating situation or that [these] delays adversely affected his prognosis[,]'" *Holden v. Hirner*, 663 F.3d 336, 342 (8th Cir. 2011) (citations omitted), unless the need for medical attention is obvious to a layperson, in which case the plaintiff need not submit verifying medical evidence to show the detrimental effects of delay. *See Schaub*, 638 F.3d at 919 (citing *Roberson v. Bradshaw*, 198 F.3d 645, 648 (8th Cir. 1999)); *Aswegan v. Henry*, 49 F.3d 461, 464 (8th Cir. 1995); *cf. Boyd v. Knox*, 47 F.3d 966, 969 (8th Cir. 1995) ("noting that a delay in treatment, coupled with knowledge that an inmate is suffering, can support a finding of an Eighth Amendment violation").

The Court wishes to stress that it is very sympathetic to Plaintiff's loss. Plaintiff's allegations concerning that loss, however, fail to meet either prong of the deliberate indifference test. Plaintiff also failed to provide any verifying medical evidence that any delay in treatment adversely affected her prognosis.

Concerning the objective prong of the test, Plaintiff was not diagnosed as pregnant by a physician or other medical professional, either before or during incarceration.  Instead, Plaintiff testified that she reported herself pregnant on intake based on the results of a home pregnancy test she bought at the Dollar Store.  (ECF No. 53-6 at 23, 28).  She took this test at the end of August 2021.  (*Id*. at 27).  She testified that she did not receive prenatal care with a physician prior to being incarcerated.  (*Id*. at 23-24, 28).  She had scheduled an appointment with the county health department, but she did not attend the appointment because she and her "ex" were fighting and arguing at the time.  (*Id*. at 24).  Thus, she was never diagnosed as pregnant by any medical professional prior to being incarcerated.  She was incarcerated for eight days in October 2021 prior to the incarceration at issue in this case (which occurred in November and December 2021).  (*Id*.).  She did not seek prenatal care from the medical providers at the jail in October.  (*Id*.).  She did not seek prenatal care from the medical providers the jail in November or December.  (*Id*. at 24, 26, 54).  Instead, she only asked for "Tums and stuff."  (*Id*. at 26).  She did not see the jail's doctor for any reason.  (ECF No. 53-6 at 54).  Even if she had been diagnosed as pregnant by a physician, it is well-established in the Eighth Circuit that "a woman's pregnancy is generally not, alone, a serious medical need."  *Coleman v. Rahija*, 114 F.3d 778, 785 (8th Cir. 1997).

In the absence of a medical diagnosis of a serious medical need, any symptoms concerning her pregnancy must have been so obvious that a layperson would easily recognize the need for treatment.  *See Jones v. Minnesota Dept. of Corrections*, 512 F.3d 478, 482 (8th Cir. 2008) (Because the deceased inmate was not diagnosed by a physician as requiring treatment, his condition "must have been so obvious that a layperson could easily recognize the need for treatment" to establish a serious medical need.).  For example, in *Pool v. Sebastian County, Ark.*, 418 F.3d 934, 945 (8th Cir. 2005), the Eighth Circuit found a serious medical need that was

obvious to a layperson where an inmate was pregnant, bleeding, and passing blood clots. In *Coleman*, the pregnant inmate's medical records indicated a history of rapid labor and premature delivery. *Coleman*, 114 F.3d at 784-85. The inmate complained of an increase in vaginal discharge, "bloody show," uterine contractions six minutes apart, and abdominal pain. (*Id*. at 784.) Of particular importance to the current case, the inmate in *Coleman* — a layperson — believed herself to be in pre-term labor and asked directly and repeatedly for specific and immediate medical care. (*Id*. at 782-85.)

Regarding general prenatal care prior to December 14, 2021, Plaintiff alleges she spoke with Defendant Mohr, the Jail Administrator, about prenatal care. She testified she told Defendant Mohr that she had an upcoming appointment scheduled at the end of November with Dr. Rocha, but she did not remember the exact date of the appointment, and her father did not bring the appointment sheet to the jail because he is disabled. (ECF No. 53-6 at 22-23, 29). Defendants' Statement of Facts indicates that the last scheduled appointment with Dr. Rocha of the Mena Center for Women's Health was February 17, 2017. (ECF No. 53 at 1). Plaintiff also testified she spoke with Defendant Mohr briefly in person about two weeks after being incarcerated, and after that, she put in a kiosk request. (ECF No. 53-6 at 55). Defendant Mohr stated in his affidavit that Plaintiff did not ask him for prenatal care, and he was not aware of any risks or complications with her pregnancy. (ECF No. 53-1 at 1). He noted she had regular access to medical care through the facility medical provider. (*Id*.). He states Plaintiff put in a Request Form on December 10, 2021, but he interpreted this request to be one for release from the detention center, not a medical request for prenatal care. (*Id*. at 2). He stressed that if she was seeking medical care, she should have put in a Medical Request rather than a general Request Form. (*Id*.). Defendants attached copies of Plaintiff's kiosk requests. The Request Form dated December 10, 2021, states:

> craig I got a plea offer of 72 months yesterday would you and Scot Sawyer consider letting me out waiting on a bed like ya'all did last time if I was to sign for it so I can get everything straight at home with my dad and little brothers and all my affairs and be able to say bye to my daughter and go to the doctor and get everything put in place for this baby im pregnant with

(ECF No. 53-3 at 8). The Court agrees with Defendant Mohr that the emphasis in this request is on release, not prenatal care. Plaintiff also made a request to Defendant Mohr for release with an ankle monitor on December 13, 2021. No mention is made of her baby or prenatal care in that request either. (*Id.* at 9). Plaintiff did not submit any medical requests between her intake on November 14, 2021, and her miscarriage on December 15, 2021. (ECF No. 53 at 1). Plaintiff also testified that she had been pregnant twice before, and she did not have a history of complications. (ECF No. 53-6 at 51). She lost her first pregnancy at 16 when she was hit in the stomach during a fight. (*Id.* at 47). Her second pregnancy carried to term when she was 22 and resulted in her daughter. (*Id.* at 48).

Plaintiff also did not make any requests for emergency medical or prenatal care, including a doctor or an ambulance, the evening of December 14, 2021. (ECF No. 53-6 at 35). In her deposition testimony she described the vaginal discharge as "snot with a little bit of blood," "just enough to see it in the mucous," and stated she "didn't think much about it," and did not know anything was wrong until 4:40 a.m. when she went into labor. (*Id.* at 58, 61-62). She further testified that when they told her to lay down, she went to the dayroom and watched TV for a little bit and then fell asleep. (*Id.* at 59). The Court viewed the videos Plaintiff indicates covered this time, and Plaintiff exhibited no obvious signs of physical distress. Plaintiff testified that Defendants Gamble and Terwilliger came in at 2:00 a.m. and told the inmates it was time for lockdown. (*Id.* at 59, 61). They asked her if she was okay, and she told them she was okay because, "at that point, I thought maybe I was since I hadn't been doing nothing." (*Id.* at 61). She

also testified she was not having any pain at that time. (*Id*.). She then laid down in her cell and slept until 4:40 a.m. when she woke up with sharp pain and feeling as though she needed to urinate. (*Id*. at 60). She testified that from 9:00 p.m. until 4:40 a.m. everything was fine. (*Id*. at 36).

Thus, Plaintiff herself did not believe anything was wrong and did not request emergency medical care on the evening of December 14, 2021. Given this fact, the Court is unable to discern how two layperson jailers could have known that she was at risk of miscarrying. The Court can find no evidence of an objectively serious medical need obvious to a layperson in the summary judgment record for December 14, 2021.

This leaves the morning of December 15, 2021. There is no dispute that Plaintiff's precipitous labor and delivery was an objectively serious medical need. Her allegations do not, however, meet the second subjective prong of the deliberate indifference test. Plaintiff testified everything was fine between 9:00 p.m. and 4:40 a.m. (ECF No. 53-6 at 36). She testified that she did not bleed until right before she delivered the fetus. (*Id*. at 34-35, 62). She stated she banged on the cell door at 4:40 a.m. because she was having pain in her back and stomach, or contractions. (*Id*. at 36). She felt like she had to urinate, felt some pressure, and then the baby was delivered. (*Id*. at 62-63). She estimated the "whole labor" took "a minute." (*Id*.). She stated no one came immediately because they were getting breakfast ready in the kitchen. (*Id*.). Defendant Gamble got to her cell about five minutes after she banged on the door, at which point she told her that she had delivered her baby. (*Id*. at 31, 36). Defendant Gamble then turned on the lights, pulled her out of the cell and put her in with her cousin in the next cell over. She brought her a pair of clean pants. She then finished serving breakfast and told Plaintiff she needed to figure out what she needed to do. (*Id*.). Plaintiff confirmed that it was about five minutes from the time she had her child until Defendant Gamble arrived at her cell. (*Id*. at 36). She testified it was about 15 minutes

after she started banging on the door before the EMT arrived.  (*Id*. at 39, 40).  The EMT placed her baby in a biowaste bag, and they were taken in the ambulance to the hospital.  (*Id*. at 32, 40).

The Court reviewed the video of that morning.  The elapsed time from Gamble coming to Plaintiff's cell door until the EMT's arrival was approximately 24 minutes.  Based on the Court's review of the videos relied upon by Plaintiff, Defendant Gamble appeared to act quickly and compassionately during that time.  The Court can find no evidence in the videos, or in the rest of the summary judgment record, that any Defendants' action or inactions meet the second, subjective prong of the deliberate indifference test.

Finally, there is no verifying medical evidence that the prison officials ignored an acute or escalating situation on December 14 or 15, 2021, or that any delays in medical care adversely affected Plaintiff's prognosis.  To the contrary, the medical records from the hospital indicate the baby was a stillbirth, and it was estimated to have been deceased for 3-5 days prior to delivery.  (ECF No. 53 at 5; ECF No. 53-8 at 7; ECF No. 64-1 at 7).  Further, Plaintiff testified that the attending doctor after her miscarriage did not give a diagnosis or any reason as to why the miscarriage had occurred.  (ECF No. 53-6 at 42).  She testified that he advised her to get an autopsy of the fetus done, but she declined to do so because she "didn't want her cut on."  (*Id*.).  She also testified the doctor did not tell her that prenatal care would have prevented the miscarriage.  (*Id*. at 43).  Finally, Defendants correctly stress that no medical evidence in the summary judgment record supports Plaintiff's contention that general prenatal care would have alerted her to an issue with the baby's health and prevented a miscarriage.  (ECF No. 64 at 2).

There is no evidence of deliberate indifference in the summary judgment record.  As there was no violation of Plaintiff's constitutional rights, it is not necessary to address any of Defendants other arguments at this time.  Summary judgment is appropriate as a matter of law.

## IV.   CONCLUSION

For the reasons discussed above, it is RECOMMENDED that Plaintiff's Amended Complaint (ECF No. 10) be DISMISSED WITH PREJUDICE.

Referral Status: This case should not remain referred as all matters have been recommended for dismissal in this Report and Recommendation.

**The parties have fourteen (14) days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 30th day of December 2024.

/s/ *Mark E. Ford*
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE